1

1       UNITED STATES DISTRICT COURT
            DISTRICT OF SOUTH CAROLINA
2              COLUMBIA DIVISION

3   ------------------------------

4   UNITED STATES OF AMERICA              CR NO.: 3:11-646
                                          Columbia, SC
5       -vs-                              December 14, 2011

6   AUGUST BYRON KREIS, III,

7           Defendant

8   ------------------------------

9

          BEFORE HON. JOSEPH F. ANDERSON, JR.
10         UNITED STATES DISTRICT COURT JUDGE
               SENTENCING HEARING
11

12  APPEARANCES:

13

14  FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                         UNITED STATES ATTORNEY
                         BY:  DEAN A. EICHELBERGER
15                       Assistant United States Attorney
                         1441 Main Street
16                       Columbia, SC  29201

17  FOR DEFENDANT:       HON. PARKS N. SMALL
                         FEDERAL PUBLIC DEFENDER
18                       BY:  ALLEN B. BURNSIDE
                         Assistant Federal Public Defender
19                       1901 Assembly Street, Suite 200
                         Columbia, SC  29201
20

21  COURT REPORTER:      DANIEL E. MAYO, RDR
                         Certified Realtime Reporter
22                       901 Richland Street
                         Columbia, SC  29201
23

24          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

25

2

1          THE COURT:  Mr. Eichelberger, please call the first

2     case.

3          MR. EICHELBERGER:  May it please the court, the case

4     is United States of America versus August Byron Kreis, III, it

5     is criminal 3:11-646.  Mr. Kreis is present, he is represented

6     by Mr. Allen Burnside.  The case is before court for purposes

7     of sentencing.  The government has reviewed the presentence

8     report and we do not have any objections.  Thank you, your

9     Honor.

10          THE COURT:  Thank you.  Mr. Burnside, good morning.

11          MR. BURNSIDE:  Good morning, your Honor.

12          THE COURT:  Have you had enough time to read over the

13     presentence report and discuss it thoroughly with Mr. Kreis?

14          MR. BURNSIDE:  I have, your Honor.

15          THE COURT:  All right.  The probation officer informs

16     me that you have objections to paragraphs 26, 43, 47, 51, and

17     85, all of which relate to the amount of the intended loss.

18          MR. BURNSIDE:  Yes.

19          THE COURT:  All right.  We will hear that in just a

20     moment.  Let me first speak to Mr. Kreis.  Mr. Kreis, have you

21     had enough time to read over the presentence report that's

22     been prepared in your case?

23          DEFENDANT:  Yes.

24          THE COURT:  Now, Mr. Burnside has made objections on

25     your behalf to the paragraphs that I just announced.  They all

1    relate to the determination of the amount of the intended loss

2    in this case, which is one factor that we look at in

3    determining a sentence.  We will hear that objection in just a

4    moment and discuss the intended loss issue.  But before we do

5    that I need to ask you if you have any additional objections

6    to the presentence report that's been prepared.

7        DEFENDANT:  No.

8        THE COURT:  All right.  You can be seated.  All

9    right.  I assume that because it is technically an enhancing

10   factor the government bears the burden of proof on this, so I

11   guess the government should go first.

12       MR. EICHELBERGER:  Your Honor, what I would like to

13   do is to proffer the line of analysis that substantiates this.

14   I will tell the court that to the extent the court has any

15   questions regarding the procedures, the regulations, the laws

16   that deal with that, Miss Tammy Hansen, who is an employee

17   with the Department of Veterans Affairs, she actually works

18   out of their Milwaukee office, she has flown down for purposes

19   of this hearing.  Not so much to testify about this, your

20   Honor, but rather to explain the procedures that are in place.

21   And I think that that's appropriate in this case, in part

22   based upon conversations that I've had with Mr. Burnside as to

23   the nature of his argument when it comes to the computation of

24   loss for purposes of relevant conduct in this case.

25           A fairly lengthy introduction to what now starts as

1    the actual analytical part of how we get to the 192 --

2            THE COURT:  As I understand it, the defendant's

3    position is even if he had correctly reported his income or

4    his outside money he would have still received some type of

5    pension and that some type of pension needs to be netted out

6    from the intended loss here.  I think from reading what the

7    probation officer says it's your position if he had properly

8    reported everything he would have gotten no money at all from

9    the government.

10           MR. EICHELBERGER:  Well, it's more than just my

11   position, that's how the system works.

12           THE COURT:  That's what I'm saying.  That's the --

13   you argue that's the way we calculate it.

14           MR. EICHELBERGER:  Yes, sir.  And so if I could I

15   would like to start back from the beginning to explain a

16   little bit about the improved pension program, and I'll try to

17   be as concise as I can but it's a little bit complicated.

18           THE COURT:  Go ahead.

19           MR. EICHELBERGER:  The factual predicates for an

20   improved pension are based on certain factors.  There is a

21   qualifying service in the United States armed force during a

22   period of war, and then there's a demonstrated financial need.

23   In this case Mr. Kreis served with the -- I believe it was the

24   United States Navy for a period of time, at least one of which

25   was during the Vietnam war era.  Obviously, Mr. Kreis has a

1    number of physical infirmities and suffers from diabetes.  As

2    a result he's had one leg amputated below the knee, he's also

3    lost a portion of a foot.  And so he has that as a disability.

4    In fact, the United States, the Social Security Administration

5    had previously deem him to be disabled.

6         Based upon that determination of disability Mr. Kreis

7    submitted an application to the Department of Veterans Affairs

8    for again what is termed an improved pension.  This is an

9    important point.  The improved pension is not based upon

10   service, it's not tied directly to service but rather it is

11   tied to demonstrated financial need.  It requires qualifying

12   service but it is not based upon that service, it's based upon

13   the demonstrated need.  Because it is based upon demonstrated

14   need there is a dollar-for-dollar offset for qualifying income

15   that a veteran receiving this pension receives.

16        The next step in the analytical thought process is

17   that congress and the Department of Veterans Affairs from time

18   to time establishes what is called a maximum annual pension

19   rate, MAPR.  And I don't know that the statutes actually say

20   this in so many words, it's sort of a combination of reading

21   things between two or three different statutes, but the basic

22   point is once a person has countable income, that is

23   offsetting income that meets or exceeds the MAPR for a

24   particular year, then that person is no longer qualified to

25   receive that particular iteration of the improved pension.

1    They can in the future, I believe it requires a passage of at

2    least one year from the time that they hit that MAPR hurdle,

3    they can in the future reapply and if they meet the

4    qualifications they can receive it yet again.

5              But what's important in this case is during the time

6    frame that we're talking about Mr. Kreis in fact was reporting

7    to the Department of Veterans Affairs that he had zero income.

8    Based upon a review of his financial records we saw that there

9    was a significant amount of money coming into accounts that he

10   controlled.  After a very detailed analysis that spans

11   multiple years we made a conservative determination that Mr.

12   Kreis had countable income during the period that he said he

13   had no income.  Based upon that it is also readily apparent

14   that as of February 2005 he reached or exceeded that MAPR.

15   Now, what that means is that at that point he was no longer

16   eligible to receive any moneys from the Department of Veterans

17   Affairs based upon his prior application for the improved

18   pension.

19             Again, his option at that point would have been to

20   reapply after approximately a one-year period.  He never did

21   that, and in fact what he did was he continually received

22   moneys from the Department of Veterans Affairs until it was

23   terminated based in part on his plea in this case.

24             From February 2005 forward for purposes of loss in

25   this case the government takes the position that all funds

1    received are relevant conduct because they are the product of

2    that initial lie of saying I have no income and in fact he did

3    have income.  And before the February 2005 period of time some

4    of the money that he received he was entitled to receive but

5    it should been a lesser amount because he had that income that

6    was coming in from time to time.

7         So if we take those two classes of moneys that he

8    received, that is the money from before February 2005 as

9    reduced by documented income, and all funds from February 2005

10   forward to the current time, that's how we get to the $192,000

11   and change.

12        I am advised by Miss Hansen that throughout this

13   period each year Mr. Kreis would receive either a new

14   certification form that he would have to fill out and say

15   whether or not he had income, he did always receive those, by

16   the way, or he would receive a notification of what his new

17   year's benefit would be and a reminder that he had an

18   affirmative obligation to tell the VA about all funds that he

19   had coming in.  Throughout this period of time he never

20   reported any moneys as having come in.  So that's again part

21   of our case in terms of establishing that amount of money.

22        But that I think substantially summarizes how we get

23   to that amount of loss.  Before I turn to my colleague Mr.

24   Burnside about that, I do want to make sure that the court

25   does not have any questions.

1          THE COURT:  I think I follow you.  I think I follow

2     you.  Pre-February of '05 if he had reported the income it

3     would have resulted in a reduction.

4          MR. EICHELBERGER:  Yes, sir.

5          THE COURT:  But once he hit February he hit the end

6     MAPR, which means it was cut off entirely.

7          MR. EICHELBERGER:  Absolutely.

8          THE COURT:  And had he reported it he would have been

9     cut off for that year.  He could have come back a year later

10     but that never happened because he never reported anything.

11          MR. EICHELBERGER:  That is correct.

12          THE COURT:  Do we know, is there a way to construct

13     what would have happened had he reported it in February of

14     '05.  Could he have come back later and gotten some money, a

15     reduced amount?

16          MR. EICHELBERGER:  At that point I think we get into

17     so many variables because we have looking at it with somewhat

18     of a jaundiced eye in that he demonstrated an ability to bring

19     in funds.  We would also be considering the fact that he

20     initially was brought into the VA and improved pension not by

21     their own determination but rather by a determination of a

22     sister agency.  So I don't think it is so simple as to say if

23     he had applied would he have qualified, if he had qualified

24     how much money would he have gotten.

25          THE COURT:  It's all hypothetical.

1          MR. EICHELBERGER:  Absolutely hypothetical.  So not

2    only are we dealing with a situation where it would have

3    required a detailed examination of all these financial

4    records, but also, I mean, it never happened so we never had

5    that opportunity.  So I suppose that the baseline irreducible

6    answer, yes, it is possible that he could have qualified, but

7    we really have no way of saying how much he might have

8    qualified for.  But what we do know is he never applied and

9    that he continued to receive benefits based upon the first

10    application and he would have been cut off as of

11    February 2005.

12          So, once again, it is the government's position that

13    all moneys received from February 2005 plus the reduced

14    amounts on account of the income should be taken into

15    consideration by this court to reach a relevant conduct loss

16    amount of $192,837.

17          THE COURT:  Do you want to have your agent confirm

18    what you told me in lieu of putting her up on the stand?

19          MR. EICHELBERGER:  That would be fine.  This is

20    Miss Hansen.  If you could --

21          THE COURT:  Miss Hansen.  If you could, step up here

22    to the microphone.

23          MR. EICHELBERGER:  Essentially what the court wants

24    to do, and you and I talked about this at times and I can

25    articulate this stuff, but I want to make sure that the record

1    is clear that I have accurately articulated both the method of

2    computation, the date of termination, and the reason for

3    termination.

4         MS. HANSEN:  That is absolutely correct.  Had Mr.

5    Kreis told us about his income for 2005 he would have

6    terminated his benefits January 1st, 2005.  He would have had

7    the opportunity at that time, we would have told him to come

8    back in the next year to reapply, but because he is under 65,

9    or was then, he would have had to show he was also personally

10   and totally disabled because he would have lost his connection

11   to the social security disability factor and he wasn't in a

12   nursing home so he would have had to prove his disability as

13   well as the qualifiers and his income and net worth.

14        THE COURT:  Thank you very much.  Mr. Burnside, if

15   you want to insist the agent be put on the stand you can.  But

16   we're talking about a highly technical matter here.  I don't

17   want to deprive you of cross-examination if you want to.

18        MR. BURNSIDE:  I would like to ask her a question.  I

19   don't care if she's on the stand.  I trust --

20        THE COURT:  Come on up and be sworn and let him ask

21   some follow-up questions if he could.

22              (Tammy A. Hansen duly sworn)

23        MR. EICHELBERGER:  If we could, your Honor, since

24   we're putting her under oath for purposes of

25   cross-examination, I'm not going to redo what we just did, but

1  I simply --

2           THE COURT:  Go ahead.

3           MR. EICHELBERGER:  -- ask Miss Hansen, just a moment

4  ago you had a brief colloquy with the court, unsworn colloquy.

5  I would simply ask you at this point whether you affirm under

6  penalties of perjury now that you have taken an oath that that

7  was a true and complete response to the court's questions.

8           MS. HANSEN:  Yes, sir.

9           MR. EICHELBERGER:  Thank you.

10          THE COURT:  Cross-examination.

11          MR. BURNSIDE:  Miss Hansen, I just have basically one

12  question, I think.  But it's the same question the court just

13  had.  You know, what would have happened, and as I understood

14  what you just said had Mr. Kreis reapplied, I don't think

15  there's any question he's disabled, he's had eight surgeries

16  in the last ten years and, I mean, is in a wheelchair.  If

17  you -- the amounts that are paid under the type benefit we're

18  talking about, if a person has income the benefits are reduced

19  dollar for dollar for that income.

20          MS. HANSEN:  That is correct.

21          MR. BURNSIDE:  Okay.  So that's sort of the starting

22  point is that if we know his income, we know what he was

23  being -- we know what he was paid, so the difference between

24  those two things is what he would have gotten had it not been

25  for the failure to report income in 2005.

1          MS. HANSEN:  It's not that simple.  Once he lost his

2    entitlement and he is not 65, he doesn't have the disability

3    status for social security any longer and he's not in a

4    nursing home, he no longer is presumptively entitled to our

5    benefit and he would have to go through a medical rating

6    process to determine his eligibility based on his disability

7    status.

8          It's a three part-process.  It's qualifying with his

9    service, it's proving his disability status through a ratings

10   decision and medical evidence and an exam, and then we look at

11   his income and his net worth.

12         MR. BURNSIDE:  We know he had the qualified service

13   because he got there to begin with.  So there's no question he

14   qualifies for that.

15         MS. HANSEN:  That is correct.

16         MR. BURNSIDE:  We know that in the past social

17   security said he was disabled.  Certainly his condition has

18   not improved.

19         MS. HANSEN:  But I'm not a medical doctor, and he

20   would have to go through an exam and we would look at that

21   evidence and then rate that evidence as to his degree of his

22   disability.  And since he's already established a way to earn

23   a living without government assistance he may not have gotten

24   that rating as a medical rating to give him a disability at

25   60 percent, or one at 40 with two or more adding up to 70

1  percent, which is what he would have to have in order to

2  qualify for this benefit.  And it's all based on the medical

3  condition.  Because he's under age and he's not presumptively

4  entitled.

5        MR. BURNSIDE:  Well, I mean, but his medical

6  condition is the same or worse than what it was when he did

7  qualify.

8        MS. HANSEN:  But we don't make that determination.

9        MR. BURNSIDE:  I understand you don't, but there's

10  medical doctors provide y'all with paperwork and somebody

11  looks at it and says whether --

12        MS. HANSEN:  That's correct.

13        MR. BURNSIDE:  But I guess the key point, at least

14  from my perspective, is that the income, we know what he --

15  y'all think you know what his income is through the extensive

16  research you did of all of his bank accounts, and so it's

17  easily established, the income that was there from 2005 until

18  2010.  If we make the assumption -- and we know that it's a

19  dollar-for-dollar offset, that's not in dispute.

20        MS. HANSEN:  Um-hmm.

21        MR. BURNSIDE:  And so it's not a hard calculation,

22  there's nothing hypothetical about it.  The only -- I guess

23  the only hypothetical we're saying is would he have qualified.

24        MS. HANSEN:  That's correct.  And that is one --

25  that's the first thing we look at is the qualifiers.  And

1    that's his service and his permanent and total disability

2    status.

3            MR. BURNSIDE:  We know he qualified physically

4    before, we know his situation hasn't --

5            MS. HANSEN:  He qualified because he had social

6    security disability.  And after that, as soon as he loses that

7    disability -- because he got our benefits he lost that social

8    security disability.  And when he loses our entitlement

9    because his income is excessive then he has to through this

10   whole process again.  There's no guarantee that he would have

11   gotten a pension.

12           MR. BURNSIDE:  Okay.  Fine.  That's all I have.

13           MR. EICHELBERGER:  There's a very minor point I want

14   to follow up on.  And let's focus in on -- Mr. Burnside was

15   asking you to hypothetically assume his -- that his client

16   would have qualified and if his client qualified would there

17   have been an offset.  Is it not fair to say that that

18   presupposes that he would have qualified?

19           MS. HANSEN:  That's correct.

20           MR. EICHELBERGER:  And you could not make that

21   determination.

22           MS. HANSEN:  I can not.

23           MR. EICHELBERGER:  And the second point, even if we

24   accepted the premise of the question, if I understood your

25   colloquy earlier with the court, you said from the point that

1    he met or exceeded the MAPR he was terminated from the program

2    and -- and I think you said that there was a period of time

3    before he could reapply.  What was that --

4            MS. HANSEN:  One year.

5            MR. EICHELBERGER:  -- period of time.

6            MS. HANSEN:  One year.

7            MR. EICHELBERGER:  And during that one year what

8    impact would that have on his eligibility to receive?

9            MS. HANSEN:  We would -- if he would have requalified

10   we could have reopened his benefits 13 months after they were

11   terminated.  So in March 2006.

12           MR. EICHELBERGER:  He could have started once again

13   receiving.

14           MS. HANSEN:  If we would have gotten that information

15   by December 31 --

16           THE COURT:  Let me jump in here.  If he had

17   truthfully reported his income in 2005 he would have reached

18   the MAPR and would have been entitled to no money for at least

19   a year.

20           MS. HANSEN:  That is correct.

21           THE COURT:  All right.  If he had come back and

22   timely and properly filed at the end of a year and truthfully

23   disclosed his income then would he still not -- would he not

24   have been at the MAPR again and therefore not entitled to it

25   again?

1          MS. HANSEN:  He would have had to reapply.  We would

2     looked at his condition and determine his eligibility for the

3     program and then we would have looked at his income and

4     requested that he prove his income, because he would have been

5     terminated because --

6          THE COURT:  But assume his medical condition wasn't

7     any different, assume he fulfilled that requirement.  If his

8     income was the same thing as it was in '05 would he still not

9     be ineligible to get any money?

10         MS. HANSEN:  That is correct, sir.

11         THE COURT:  Because he was at MAPR again.

12         MS. HANSEN:  That is correct.

13         MR. EICHELBERGER:  And if I could, your Honor, I want

14    to make sure the record is clear here.  The facts that we have

15    do not show a static income throughout this period of time.

16    It changed at various times.  So we are not taking the

17    position that in 2006 had he reapplied he would similarly have

18    been disqualified, having met or exceeded MAPR.  He may have

19    qualified because I think his income actually went down at

20    some point.  The agents are confirming that to me.

21         THE COURT:  But we don't know since he never

22    truthfully reported.

23         MR. EICHELBERGER:  Correct.

24         MS. HANSEN:  Right.

25         MR. EICHELBERGER:  And the further point, though, is

1    that -- and what we just did with Miss Hansen is for a period

2    of at least 12 months there would have been no eligibility at

3    all because he had met or exceeded the MAPR in 2005.

4           During that period of time do you recall the

5    approximate amount of money that Mr. Kreis was receiving from

6    2005?  From the point where he should have been terminated for

7    the next 12 months, do you recall approximately --

8           MS. HANSEN:  I have it in my bag.

9           MR. EICHELBERGER:  Okay.  Was it approximately 25,

10   $2,600 per month, do you recall?  If you can -- if you want to

11   look.

12          THE COURT:  You can step down to look at --

13          MS. HANSEN:  May I look?

14          THE COURT:  I think it's worth doing.

15          MR. EICHELBERGER:  Because there's a final fairly

16   important point I want to make with respect to that issue.

17          (There was a pause in the proceedings)

18          MR. EICHELBERGER:  All right, Miss Hansen.  Having

19   checked your notes, were you able to determine the amount that

20   Mr. Kreis was in fact paid during that window period that

21   we're talking about?

22          DEFENDANT:  Yes.  For calendar year 2006, with the

23   adjustments we made with the income that we knew about that is

24   also part of this $192,000 debt, we would have reduced his

25   benefits to $2,057 a month for that calendar year.

1          MR. EICHELBERGER:  Okay.  Do your records show how

2    much in fact he was paid?  Are you saying that's what it was

3    reduced to?

4          MS. HANSEN:  Um-hmm.

5          MR. EICHELBERGER:  How much in fact was he paid

6    during that period of time?

7          MS. HANSEN:  That's -- I'm sorry.  That's how much he

8    was paid.

9          MR. EICHELBERGER:  Okay.  So roughly 2,000 and some

10   change, 21 and --

11         MS. HANSEN:  $57 a month.

12         MR. EICHELBERGER:  $2,057 per month.

13         MS. HANSEN:  Yes.

14         MR. EICHELBERGER:  12 months, a little bit over

15   $24,000 for that period of time.

16         MS. HANSEN:  Yes.

17         MR. EICHELBERGER:  And those are moneys that he

18   received that based upon having met or exceeded MAPR he would

19   not have been entitled to receive?

20         MS. HANSEN:  That's correct.

21         MR. EICHELBERGER:  Any of those funds.  So at this

22   point then we're dealing with pre-February 2005 and at least

23   to say February or March of 2006.

24         MS. HANSEN:  Yes.

25         MR. EICHELBERGER:  He got roughly $24,000 in 2006.

1          MS. HANSEN:  Yes, sir.

2          THE COURT:  But you said prior to that he was -- he

3    would have gotten reduced amounts --

4          MR. EICHELBERGER:  The point that I was making is

5    really sort of a rebuttal to the suggestions from counsel that

6    he should have received a dollar-for-dollar offset for the

7    period of time and all -- the only thing I attempted to do

8    here is show that even if we were to accept that

9    presupposition, during that 12-month period that in fact would

10   not be the case.

11         THE COURT:  All right.  Any further questions?

12         MR. BURNSIDE:  No, your Honor.

13         THE COURT:  Thank you very much.  You may step down.

14   Any additional evidence from the government on this?

15         MR. EICHELBERGER:  No, your Honor.

16         THE COURT:  Mr. Burnside, you want to put up any

17   evidence or argue?

18         MR. BURNSIDE:  Just argue.

19         THE COURT:  I think I understand the government's

20   position.  Let me hear from the defendant.

21         MR. BURNSIDE:  I think Mr. Eichelberger is making it

22   a lot more complicated than it needs to be by bringing in all

23   the regulations and everything that the VA would normally do

24   to calculate a pension.  Most of all this court is a court of

25   equity, and I think if you look at what you are trying to

1    determine an appropriate sentence is the true nature of the

2    crime.  And I think the nature of the crime here is the loss

3    amount.

4        You asked the key question before we even got into

5    this thing, is what would have happened if he had reported all

6    of his income.  And I believe as I understand Miss Hansen, it

7    would have been -- there would have been an offset if he had

8    reported all of his income, even as we just learned there was

9    the year of 2006 which might be different, but if he had --

10   because he would have been disqualified from 2005.  But other

11   than that there would have been an offset.

12       And I think looking at the amount of income is sort

13   of the key point.  And the government knows, I mean they have

14   done an exhaustive search, they included all kinds of things

15   in income that were basically Mr. Kreis selling property that

16   he owned.  But, I mean, they consider that income.  So that's

17   in the figure they used as $67,000.  Also included in that is

18   some money that was borrowed.  But we're willing to agree that

19   that $67,000 is the amount of income that should have been

20   reported, just for the ease of calculation, because I think it

21   gets closer to the true nature of this crime.

22       And I think that's what the guidelines direct you to

23   do.  There is a guideline right on point that I cited in the

24   addendum that deals with government benefits.  It's an

25   application note to 3Fii, and it says in a case involving

1    government benefits such as entitlement program payments, loss

2    shall be considered to be the value of the benefits diverted

3    to the unintended use.  The value of the benefits diverted to

4    the unintended use.

5         Well, you know, there's no question that Mr. Kreis is

6    disabled.  He was found to be disabled by both the Social

7    Security Administration and then the VA.  So that's not an

8    issue.  There's no question he served in the Navy during the

9    Vietnam war so he qualifies on that basis.  And so, you know,

10   it's not a complicated matter to say well, if he had reported

11   his income what would his payments have been.  Which is

12   exactly the question you asked, and we established through

13   Miss Hansen that there's a dollar-for-dollar offset.

14        THE COURT:  At best it's just unclear as to what he

15   would have gotten in years subsequent to 2006.  And it's made

16   unclear because your client didn't properly report.  I mean, I

17   just wonder if the -- the unclearness or ambiguity, if he

18   should benefit from that.

19        MR. BURNSIDE:  It's not unclear.  Because the

20   government's investigation, they went through his bank records

21   and we have got 3,000 pages of discovery in this case where

22   they spent untold hours of the agent's time determining

23   exactly what his income was.  In their investigation they

24   looked at everything in the light most favorable to them.  So

25   the income is certainly not any more than this $67,000 figure.

1    It's not -- that's not unclear.

2            THE COURT:  So what do you say the loss should be?

3            MR. BURNSIDE:  Judge, if we look at everything in the

4    light most favorable to the government it would be $67,447.

5    And so I mean I think that that is an appropriate amount.  I

6    mean, that would be an amount that the court could look at and

7    say well, this was the fraudulent amount, this is the fraud.

8    You are not here to determine what was the overpayment, you

9    are here to determine what the fraud was.  And the fraud in

10   this case was the failure to report the income.  I mean, that

11   was the crime.  And, you know, so the income is the figure

12   that's -- should be the most important figure in determining

13   the guidelines.

14           And I think that's what the note is talking about.

15   It was the amount of money that was diverted to unintended

16   use.  So I mean, he was -- he should have gotten some money.

17   If he had done everything right he would have gotten some

18   money.  And the government wants to say, because of these

19   technicalities they want to say well, we're going to pretend

20   like he was never entitled to anything.  But that's just not

21   true.  That's not the way -- I mean, he was definitely

22   entitled to some money and they want to ignore that

23   completely.  Which, you know, I think, I mean a just sentence

24   can still be reached by looking at the amount of money that he

25   failed to report.

1           THE COURT:  All right.  I would like to take a recess

2    and consult with the probation officer, if we could,

3    because --

4           MR. EICHELBERGER:  Before the court --

5           THE COURT:  Go ahead.

6           MR. EICHELBERGER:  Would the court permit me very

7    briefly --

8           THE COURT:  Go ahead.

9           MR. EICHELBERGER:  -- refute a couple of points here.

10   I wrote down in my notes here not so fast, and did I that

11   twice.  In part because Mr. Burnside first stated there's no

12   question that his client is disabled.  Disabled in this case

13   is somewhat of a term of art.  I do not dispute that Mr. Kreis

14   has a disability.  But that physical disability does not

15   necessarily equate to disabled, that is, unable to earn an

16   income.

17          We know that's not the case because in fact he had

18   income during the period that he had a disability.  So not so

19   fast on saying there's no doubt that he was disabled.

20          THE COURT:  So if he had -- if he had truthfully

21   reported in '05, February of '05, the government could have

22   come back and said well, since you have been earning this

23   money you aren't disabled.

24          MR. EICHELBERGER:  That's a possibility.

25          THE COURT:  Failing step one we don't need to look at

1   amount of money earned.

2          MR. EICHELBERGER:  Right.  But the argument, the

3   essence of the argument is even though Mr. Kreis falsely said

4   he had no income, that the court should nonetheless assume

5   that he qualified throughout and give him credit of income

6   against the amounts of money that he in fact received.

7          And that leads me to the second not so fast.  And

8   that is that he stated that the dollar figures that we used

9   were, in his terms, in the light most favorable to the

10  government.  Well, in fact, that is not how we did this.

11         Mr. Kreis' attorney made the point that some of these

12  funds were loan funds.  In fact, in the first iteration of

13  this financial analysis financial loans were included by the

14  people doing that analysis.  As we sat down, myself in

15  conjunction with those people, we saw that there were a number

16  of documented loan funds that were coming in and at our

17  request those funds were in fact taken out.

18         We tried to take a conservative approach where we

19  gave Mr. Kreis the benefit of the doubt as opposed to looking

20  at those figures from the light most favorable to the

21  government because we wanted to avoid that very type

22  suggestion of how we had computed those numbers.  So those are

23  my two not so fast.  I promised I'd be short.  I'm done.

24         MR. BURNSIDE:  I've got to respond to the very last

25  comment about the loan funds.  I did go to a great deal of

1  trouble to subpoena records from where these funds were

2  borrowed.  They were basically borrowed from Cash America,

3  which is a payday advance loan thing service, and there are at

4  least -- I can't prove this other than through Mr. Kreis, but

5  he says that they had a practice of borrowing money,

6  depositing it in cash into their bank account in order to

7  cover checks that they had written.

8         And so some of this, there are moneys in the $67,000

9  that appear to the government to be cash deposits but, I mean,

10 that at least in our way of thinking that was loan deposits.

11 I'm not disputing, you know, I'm not trying to fight them on

12 the $67,000 that they have come up with.  But, you know, I

13 don't think all that is income.

14        And I don't know how they are going to sit there and

15 say, you know, it's not so clear that he's disabled.  He's in

16 a wheelchair, he's missing half of one foot and his leg at the

17 knee.  And $67,000 we're talking over a five-year period of

18 time with him married and seven kids under 17 years old.  And

19 so this is not a lot of money.  This is a family that was

20 trying to keep a roof over their head.  So this is a crime of

21 extreme financial hardship.

22        DEFENDANT:  I got to say something.  I got to say

23 something.  Your Honor, my lawyer asked me to keep my mouth

24 shut.  I can't sit here --

25        THE COURT:  I was going to recognize you later to

1    speak, but if you want to speak now go right ahead.

2         DEFENDANT:  Well, this is a means to the end for the

3    government, because they don't like my beliefs.  And anybody

4    that watched this whole fiasco would know the same thing.  You

5    are not stupid.  I could sit here and talk about my views on

6    everything.  They haven't changed.  Six months later I still

7    feel the same about everything.

8         What I did was I was taking care of my money to the

9    best of my ability.  A dollar for dollar, in the time when I

10   did intentionally not report money was when I received the

11   $14,000, I guess that's in 2005, from the sale of a house that

12   belonged to a friend of mine that I lived in up in Potter

13   County, and another 7,500 that I received for a dog bite

14   injury for my daughter, my three-year-old daughter.  Them I

15   intentionally did not tell them about.

16        Other money that I accepted through the organization

17   that they know about, fine.  I mean, I wasn't trying to hide

18   it then, I'm not hiding it now.  Did I report it?  No.  Should

19   I have?  Yes.  But I didn't, knowing all you heard what you

20   have to go through in order to get a pension, period.

21        The VA is the one that did all the operations, so if

22   they didn't -- if they didn't think I was sick enough to cut

23   my foot -- half of my foot off and my leg off they would have

24   never done that.  That was all done in VA, wasn't done outside

25   the Veterans.  I think a lot of the veterans hospital's I

1    think they are really good now.

2            But what I did over these years I did not do to build

3    riches.  I mean, nothing that -- that I own is new, it's

4    everything is hand me down.  I did eBay, sold used clothing

5    and electronics.  A lot of them were mine and I felt why

6    should I report money that I already made a long time ago that

7    had nothing to do with earned income.  Like working under the

8    table, I didn't do that.

9            People helped me out, yes.  They sent donations to

10   Aryan Nation and I cashed the checks, yes.  I put them right

11   in the bank.  I didn't try to hide anything.  From 2003 when I

12   was down in Florida I started with cash advance, because I

13   couldn't afford to live on what the government was giving me.

14   And dollar for dollar if you report anything they take it

15   away.

16           So they're saying I had to live with my family from

17   when they first started giving me the money on whatever they

18   gave me and if I couldn't do that, paying rent and food and

19   utilities and everything, they would take it away dollar for

20   dollar.  So anybody in their right mind in my position

21   wouldn't report it.  And they don't report it.  I'm not -- I

22   can't be the only one like this.  I mean, I know other vets

23   who go through the same thing.

24           So all I'm trying to say is I took out loans from

25   2003 on up from Cash America and the moneys that I took were

between $300 and $600 a month cash.  Now, they are under
investigation and I already signed up for a class action suit
against them.  But when he went -- my lawyer Mr. Burnside went
checking for that to get evidence on that he could only get
evidence from 2008 to 2010 and he does have that evidence of
the cash that I took out.

But how do you prove that we took it out and put it
in?  You know, I mean, in order to do that you would have to
look at every, you know, every check that I wrote, and a lot
of it was in cash.  I take the money from cash advance, at the
end of the month I go back and pay them.  I pay them either
$95 a month or $25 a month interest on the money that I was
using.  And every month it had to be paid before you could
take it back out again.  They conveniently lost, or whatever
they told my lawyer, records before 2008.  So they are gone.

So my contention is the money that they are saying
that the government can't prove because they don't know where
it came from or how it got there, I'm not denying that all the
money that they -- that I put in with checks and stuff.  My
mother-in-law gave me -- gave us $5,000 over a period of five
years, or whatever it was.  I sold my AK-47 for 1200, I sold
my AR-15 for a grand.  I didn't report it, none of it.

So I know, you know, not understanding the law is no
excuse.  All right, I understand that.  But what I'm saying is
I was taking care of my family, I wasn't building up riches.

1   They wanted to know, you know, how I'm affording to do -- to

2   take care of Aryan Nations.  It's a website, it's a website

3   with believers.  And, believe me, it's a very small cog in the

4   wheel right now compared with everybody that knows what I

5   know.  And my disappearance or missing six months didn't

6   affect anything from going on.

7          But this has been a cat and mouse game with the FBI

8   and myself for quite a few years.  And this is just a means to

9   an end for them to teach me, you know, that I can't say FU to

10  the CIA and FBI without -- and get away with it.  So did they

11  hurt me?  I'm being taken care of.  I lost weight, I feel

12  good.  I feel better now than when I came in here the first

13  time.  I feel a lot better, healthier.

14         My family is suffering.  They are sitting in a motel

15  right now because they couldn't pay the rent because they cut

16  off my pension.  Now they are paying -- they wanted me to live

17  on 24 -- this is at the end, 2,469 a month for seven children

18  and two adults.  Not possible.  Not without rent control.

19  Because half of it was going to the rent and the other half

20  going to food and utilities.

21         THE COURT:  Are you still receiving your social

22  security?

23         DEFENDANT:  No.  No, when you get veterans pension,

24  just like she said, that's the truth, they cut you off of

25  social security disability and then you take whatever they

1    give you for the pension.  Now, I didn't understand all of it

2    before I got involved with it.  I had a friend of mine tell me

3    that it would be better for you to get the veterans pension

4    than social security.  But just through all the hoops they

5    talk about, you don't have time to go through these hoops when

6    you have children, when you have a family, when you are

7    raising your -- when you are raising your family.

8         I know my views are different than the norm, but I

9    haven't got up there and hurt anybody.  I don't preach to go

10   out there and hurt anyone but maybe the Jew.  You know, I do

11   have a problem with them.  But that's my own business.  That's

12   my First Amendment right.  I'm going to continue that even

13   when I get out of here.  I've stopped it.  I could have

14   continued it while I was in prison but I decided to give it a

15   break and just do the time and see what happens.

16        Yahweh God is going to do whatever is right for me in

17   the end anyway, and he's the only one I need answer to.  As

18   long as I obey God's laws I don't care about anything else.

19   But I just wanted you to hear from me, you know, how I looked

20   at it.  And what I did was not an intent do defraud the

21   government of the United States, I was just trying to -- I'm

22   not one that can go and vote myself a raise so I did the next

23   best thing.  You know, I did, I kept my mouth shut when maybe

24   I shouldn't have.  If I would have known back then, even known

25   what I'm going through today I don't think I would have done

1    anything any different than I did.  Only because I didn't have

2    a choice back then, you know?  I don't have a choice now.  I

3    mean, my wife, there's -- they're being helped by the Baptist

4    Church and they don't like my views either.  But they are

5    being real Christian about it.

6        THE COURT:  All right.  Thank you, sir.  Well, I

7    don't want to cut you off.  Do you have you anything else?

8        DEFENDANT:  No, I'm fine.  I just wanted to, you

9    know, I wanted my side of the story to be told, you know.

10        THE COURT:  Let's take a ten minute recess.

11        MR. EICHELBERGER:  Thank you, your Honor.

12        (A recess transpired)

13        THE COURT:  All right.  Anything further on this

14   intended loss objection?

15        MR. EICHELBERGER:  Nothing from the government.

16   Thank you.

17        MR. BURNSIDE:  Nothing from Mr. Kreis, no.

18        THE COURT:  Well, after hearing from counsel and the

19   witness who testified, and reviewing the presentence report

20   and consulting with the probation officer, I find that the

21   government has carried its burden of proof by a preponderance

22   of the evidence to show that the intended loss is the amount

23   indicated in the presentence report as drafted, which is the

24   $192,837.  That figure will be used for guideline calculation

25   and also for restitution.

1          The probation officer tells me this might be somewhat

2    of a moot point with the guidelines because he's already been

3    in jail over six months, is that correct?

4          MR. BURNSIDE:  Six months and a week.

5          THE COURT:  All right.  So with that, having

6    overruled the objection, it looks as though we're looking at

7    the following:  Under the statute there's a five year maximum

8    sentence.  Under the advisory guidelines the offense level is

9    13, criminal history category is one.  The defendant is not

10   eligible for straight probation, he will be eligible for a

11   split sentence.

12         The guideline sentencing range is 12 to 18 months,

13   supervised release following imprisonment is one to three

14   years, the fine was not calculated because of inability to

15   pay.  The restitution figure, as I said, is $192,837, and the

16   special assessment is $100.

17         Does the government wish to be heard on the matter of

18   sentencing generally?

19         MR. EICHELBERGER:  Your Honor, in the plea agreement

20   we agreed that we would not oppose a sentence at the bottom

21   end of the guideline range.  We stick to that commitment.

22         THE COURT:  The bottom end will be a split sentence

23   of six months incarceration, which he's already served, and

24   six months of home confinement.

25         MR. EICHELBERGER:  Our plea agreement actually went

1    down that full line of analysis and said if it wound up being

2    a six months split sentence that there was at bottom end of

3    the guideline range we would not oppose a split sentence.  Our

4    plea agreement is very detailed on that point.

5            THE COURT:  The split sentence is six months

6    incarceration and six months home confinement.

7            MR. EICHELBERGER:  Yes, sir.

8            THE COURT:  We have got a problem with that because

9    he's living in a motel, according to Probation, and that's a

10   real problem in terms of --

11           MR. EICHELBERGER:  That's more of a logistical

12   problem in terms of the government's position with respect to

13   the sentence to be imposed.  The guidelines in this case, the

14   advisory are 12 to 18.  They can be satisfied by six months

15   custody, which he has in fact served, six months on

16   intermediate -- there are various options that are available

17   to the court for purposes of that second half.  We do not take

18   a position in part because of what we have committed ourselves

19   to in the plea agreement.

20           THE COURT:  All right.  Thank you.  Mr. Burnside?

21           MR. BURNSIDE:  Thank you, your Honor.  Judge, as far

22   as Mr. Kreis' family situation right now, his wife and

23   children are having a very hard time.  They were -- the

24   pension was cut off I believe in October.  They were evicted

25   from the home they were in about a week ago.  They thought

1     they had a new place lined up, and I think she still believes

2     that there's a new place lined up but she has not been able to

3     make the move yet.  A Baptist church in Kentucky has put them

4     up in a motel while she's trying to make this transition.

5          They have also applied for Section 8 housing, so they

6     expect to have a stable residence either in Kentucky or

7     Tennessee.  They are right on the -- South Fulton and Fulton

8     are right on the line between Tennessee and Kentucky.  So I

9     guess to get to the bottom line, my request is that the court

10    follow the plea agreement that we reached with the government

11    and order a sentence of time served with six months home

12    confinement but allow the home confinement to begin.  I

13    believe it could begin fairly quickly once they have a stable

14    residence.  So, I mean, that is going to be my ultimate

15    request to the court.

16          THE COURT:  All right.  Well, if he gets a stable

17    residence that will serve for home confinement.  But to be

18    electronically monitored you've got to have a land line phone,

19    too.  We can't dispense with that part of it.

20          MR. BURNSIDE:  Yes, sir.  I think they probably have

21    other ways of monitoring to make sure he's home.  He's not --

22    Judge, I mean, he has no prior record of any kind, he's in a

23    wheelchair so he's not mobile enough that he's going to be

24    trying to get away.  You know, he basically is going to be at

25    home anyway.  That's basically what he does is stay home.

1          THE COURT:  All right.

2          MR. BURNSIDE:  I don't know electronic monitoring is

3     necessary.  When he's out I know he's going to try to

4     reestablish his social security at some point.  He may try to

5     reestablish his VA benefits.  I expect there may be some type

6     of offset for the money that the court orders here.  I'm not

7     sure how he's going to wind up as far as how much he's going

8     to be able to contribute to the family.

9          He's 57 years old, he has been married to the same

10    lady for 20 years, does have seven children under 17 years

11    old.  He's had a very difficult time the last six months.

12    He's been in Lexington County jail, he's been basically in

13    solitary confinement over there.  He's been held in cells,

14    it's not handicapped accessible.  He's taken a couple of falls

15    in his cell trying to do various things that you have to do.

16    Had a giant knot on his elbow one I day when I went to see

17    him.  So I do know he suffered a lot while he's been locked

18    up.  He does have the health problems that are listed in the

19    presentence report.

20         Judge, I do think that he's been punished

21    sufficiently and would ask the court to impose a sentence of

22    time served, six months home confinement to begin when he has

23    a stable residence.

24         THE COURT:  All right.  Now, Mr. Kreis, you've

25    already spoken earlier but you have a right at this time to

1    make any additional statements that you wish.  This is your

2    chance to speak, I have not decided upon a sentence yet in

3    your case, I'll be glad to hear from you.

4         DEFENDANT:  I have no -- nothing further really,

5    other than to ask the veterans affairs lady if my -- if I

6    still get my medical.  Has that been taken away, too?

7         MR. BURNSIDE:  I think he's talking --

8         MR. EICHELBERGER:  That is really more of an

9    administrative civil matter, your Honor, I would submit.

10        THE COURT:  I don't think I have any authority over

11   that.

12        MR. EICHELBERGER:  Thank you.

13        THE COURT:  All right.  Having calculated and

14   considered the advisory sentencing guidelines, and also the

15   relevant statutory sentencing factors contained in Section

16   3553(a) of Title 18, it is the judgment of the court that the

17   defendant August Byron Kreis III is hereby committed to the

18   custody of the Bureau of Prisons to be imprisoned for a term

19   of time served.

20        It is further ordered that the defendant pay

21   restitution in the amount of $192,837 to the Clerk of the U.S.

22   District Court, 901 Richland Street, Columbia.  Restitution is

23   due immediately and interest on the restitution order is

24   waived.

25        I find the defendant does not have the ability to pay

1    a fine, therefore the fine is waived.  You shall, however, pay

2    the mandatory special assessment of $100, due immediately.

3            Upon his release the defendant shall be placed upon

4    supervised release for a term of two years.  Within 72 hours

5    of his release he shall report in person to the probation

6    office in this district.  While on supervised release the

7    defendant shall comply with the mandatory and standard

8    conditions of supervision outlined in Section 3583(d) of the

9    Title 18, and also the following special conditions:  Number

10   one, the defendant shall be placed on home confinement without

11   electronic monitoring for a term of six months.  And, number

12   two, any unpaid balance of restitution shall be paid in

13   minimum monthly installments of $100 beginning 30 days after

14   his release from custody.

15           Now, the clerk pointed out to me I did not formally

16   adopt the presentence report after overruling the objection.

17   Suffice it to say that I have I have adopted the report as

18   written, having overruled the one objection that was filed.

19   And the report constitutes my findings for purposes of

20   sentencing in this case.

21           Now, Mr. Kreis, you have a right to appeal the

22   sentence the court has imposed today.  If you wanted to appeal

23   you would have to file your notice of appeal within 14 days

24   from the day the judgment order is filed in your case.  If you

25   wish to appeal and could not afford an attorney the court

1   would appoint one for you.

2          Do you have any remaining counts to be dismissed?

3          MR. EICHELBERGER:  We do.  Move to dismiss the

4   remaining counts.

5          THE COURT:  All right.  On motion of the government

6   the remaining cautions are dismissed.  My reasons for imposing

7   this sentence are as follows:  First, as stated, I adopted the

8   presentence report, overruling the one objection filed.  I've

9   carefully considered all the 3553(a) factors, including the

10   nature and circumstances of the offense.  Here the offense

11   included a failure to report income that enabled the defendant

12   to obtain government benefits to which he was not entitled.

13          I do note that this is not a case such as some that

14   I've had where the defendant is able bodied and out earning

15   income by some physical exertion and falsely reporting to the

16   government that he's disabled.  We don't have that type case

17   here.  Here the money that came in was loans, gifts from

18   friends, sale of property, and so forth.  It nevertheless

19   should have been reported.  But the point being it's not as

20   egregious a case as if he were reporting himself to be

21   disabled and out performing physical labor, earned wages and

22   salaries and so forth.

23          I've also considered the history and characteristics

24   of the defendant.  He has no criminal record, he has served in

25   the military.  I'm aware that he has a wife of 20 years and a

39

1    large family.  He's been in the Lexington County facility for

2    over six months.  That's much more draconian conditions there

3    than in a normal prison facility, so I took that into account.

4            I've also considered the need for the sentence

5    imposed to reflect the seriousness of the offense, to promote

6    respect for the law, to provide just punishment and adequate

7    deterrence, and to protect the public from future crimes of

8    the defendant.  And I note that the sentence imposed is

9    essentially the sentence requested by both the government and

10    defendant.  Those are my reasons.

11            MR. EICHELBERGER:  Thank you, your Honor.

12            MR. BURNSIDE:  Thank you, your Honor.

13            THE COURT:  Thank you very much.

14            (Proceedings conclude)

15

16            I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
17

18    Date:  1-30-12                    s/  Daniel E. Mayo

19

20

21

22

23

24

25